**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Cyril Mamola III, and Rhonda Mamola, | No. CV-08-1687-PHX-GMS |
| Plaintiffs, | **ORDER** |
| vs. | |
| Group Manufacturing Services, Inc, an Arizona corporation, | |
| Defendant. | |

Pending before the Court are the parties' separate Motions for Summary Judgment. (Dkt. ## 130, 132.) Both Motions are granted-in-part and denied-in-part, as set forth in this Order.[1]

**BACKGROUND**

Plaintiffs Cyril and Rhonda Mamola (collectively "Plaintiffs") initiated the instant employment discrimination action against Group Manufacturing Services ("GMS" or the "Company") after Mr. Mamola was terminated from his employment at GMS. (Dkt. # 1.) The facts giving rise to Plaintiffs' lawsuit, which are generally undisputed, are as follows.

---

[1] The parties' requests for oral argument are denied as the Court has determined that oral argument will not aid in its decision. *See Lake at Las Vegas Investors Group, Inc. v. Pac. Malibu Dev.*, 933 F.2d 724, 729 (9th Cir. 1991).

Mr. Mamola began working at GMS as a salesmen in 1992. For the latter portion of his career, he was also one of the Company's top salespeople, generating significant revenue for GMS. (*See* Dkt. ## 133 ¶¶ at 1–4; 140 at ¶¶ 1–4.) On May 9, 2005, Mr. Mamola experienced a severe automobile accident that left him injured and cosmetically disfigured. (Dkt. ## 133 at ¶ 7; 140 at ¶ 7.) As a result of the accident, Mr. Mamola suffered a brain injury, lost his left eye, began having periodic seizures, and underwent a series of surgeries aimed at correcting his medical problems. (Dkt. ## 133 ¶¶ 8–15; 140 ¶¶ 8–15.) Following the accident, Mr. Mamola was hospitalized for about two weeks and spent approximately three months on medical leave. (Dkt. ## 131at ¶ 9; 139 at ¶ 9.) Upon return from leave, Mr. Mamola resumed his position as a salesmen at GMS, earning a salary of approximately $103,000 per year. (Dkt. ## 131 at ¶ 66; 139 at ¶ 66.)

A few months after returning to GMS, Mr. Mamola was involved in another automobile accident. This accident apparently resulted from an involuntary seizure that Mr. Mamola suffered while behind the wheel. (Dkt. ## 131 at ¶ 12; 139 at ¶12.) Upon learning of the seizure, GMS notified Mr. Mamola that he would not be permitted to drive Company vehicles or his own vehicle on Company business. GMS further instructed that it would arrange transportation when Mr. Mamola needed to travel for work. (Dkt. ## 131 at ¶¶ 13–14; 139 at ¶¶ 13–14.) Thereafter, on May 2, 2006, Mr. Mamola was involved in another automobile accident when he suffered a seizure and drove his car into a tree. (Dkt. ## 131 at ¶ 16; 139 at ¶ 16). Following this second seizure, GMS reiterated that Mr. Mamola would need approval from his physician or the Arizona Motor Vehicles Division before he could drive on Company business. (Dkt. ## 133 at ¶¶ 45–47; 140 ¶¶ 45–47.) According to GMS, Mr. Mamola never sought reinstatement of his driving privileges. (*See* Dkt. ## 131 at ¶ 21; 139 at ¶ 21.)

On January 16, 2007, approximately eighteen months after the initial car accident that resulted in his injuries, Mr. Mamola underwent an additional surgery to correct an issue with his prosthetic eye. (Dkt. ## 133 at ¶¶ 56–65; 140 at ¶¶ 56–65.) Because what remained of his left upper eyelid had shrunk, his prosthetic eye had been falling out when he bent over. (Dkt.

1  ## 131 at ¶ 23; 139 at ¶ 23.) Because the surgery required a recuperation period of
2  approximately five weeks, Mr. Mamola requested intermittent leave pursuant to the Family
3  Medical Leave Act, 29 U.S.C. § 2601 ("FMLA"). (Dkt. ## 131 at ¶¶ 24–25; 139 at 24–25.)
4  And while Mr. Mamola's FMLA-leave request was not timely under the notice provisions
5  of that statute, GMS granted Mr. Mamola's request for FMLA leave. (Dkt. ## 131 at ¶ 38;
6  139 at ¶ 38.)

7  During this leave of absence, Mr. Mamola also requested permission to obtain email
8  access so that he could work from home while he was recuperating from surgery to his
9  eyelid. (Dkt. ## 133 at ¶¶ 74–76; 140 at 74–76 .) GMS, however, rejected Mr. Mamola's
10  request, citing concern over the "security and integrity" of the Company's "computer
11  network and data." (Dkt. ## 131 at ¶ 40; 139 at ¶ 40.) Believing that GMS withheld remote
12  access to its email server based on his disability and gender, Mr. Mamola subsequently filed
13  a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC").
14  (Dkt. ## 133 at ¶¶ 90–93; 140 at 90–93.) The EEOC later issued Mr. Mamola a notice of his
15  right to sue. (Dkt. ## 133 at¶ 187; 140 at ¶ 187.)

16  On March 12, 2007, Mr. Mamola returned to work. (Dkt. ## 133 at ¶ 115; 140 at ¶
17  115.) Upon return, he submitted his signed 2007 Compensation Agreement, which provided
18  the essential terms and provisions of his employment with GMS. (*See* Dkt. ## 131 at ¶ 50;
19  133 at ¶ 115; 139 at ¶ 50.) When GMS' President, Tim Maze ("Maze"), received the
20  Agreement, he noticed a discrepancy between the date of the Agreement and the date on
21  which GMS sent the Agreement to Mr. Mamola via fax. (Dkt. ## 131 at ¶ 54.) Though the
22  Compensation Agreement was faxed to Mr. Mamola on January 29, 2007, Mr. Mamola
23  indicated that he signed the Agreement on January 18, 2007. (*Id.*)

24  The next day, March 13, 2007, Maze scheduled a meeting with Mr. Mamola to discuss
25  the discrepancy. (Dkt. ## 131 at ¶ 58; 139 at ¶ 58.) According to GMS, Maze believed that
26  Mr. Mamola had falsified his Compensation Agreement by backdating the Agreement. (Dkt.
27  # 131 at ¶ 57.) During this meeting, Maze apparently asked Mr. Mamola whether he actually
28  signed the Agreement on January 18, 2007. (*Id.* at ¶ 59.) After Mr. Mamola indicated that

he did, Maze promptly pointed out that he could not have signed it until January 29 because GMS did not fax the Agreement until then. (*Id.*) Maze then proceeded to terminate Mr. Mamola for falsifying a company document. (*Id.* at ¶ 60.)

Plaintiffs, however, assert that this reason for terminating Mr. Mamola is pretext for discrimination and/or retaliation. (Dkt. ## 133 at ¶¶ 66–73; 139 at ¶ 52.) According to Plaintiffs, GMS pressured Mr. Mamola to sign the Agreement by January 18, 2007; yet, GMS did not provide him with a copy of the Agreement until January 29, 2007. (*Id.* at ¶¶ 66–73.) Mr. Mamola further asserts that he dated the Agreement the way he did because he understood January 18, 2007 to be the effective date of the Agreement. (*Id.* at ¶¶ 90–93.)

On September 12, 2008, Plaintiffs brought suit against GMS, alleging that the Company violated several provisions of federal employment law. First, Plaintiffs claim that GMS violated the Americans With Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), when it denied Mr. Mamola's request to work from home while he was recuperating from eye surgery. Plaintiffs also allege that GMS violated the ADA when it terminated Mr. Mamola for filing a Charge of Discrimination with the EEOC. Third, Plaintiffs allege that GMS violated the FMLA because it terminated Mr. Mamola for requesting and taking FMLA leave. Fourth, Plaintiffs allege that GMS violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), when it denied Mr. Mamola's request to work from home but allowed similarly situated female employees to do so. Finally, Plaintiffs assert that GMS violated the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"), because it required Mr. Mamola to work overtime hours without paying overtime wages.

GMS now moves for summary judgment on each of these claims. (Dkt # 130.) Plaintiffs have also filed a separate motion for partial summary judgment with respect to various aspects of their claims. (Dkt. # 132.) Both parties also seek discovery sanctions, alleging that the other destroyed relevant evidence. (Dkt. ## 132, 141.)

**LEGAL STANDARD**

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine issue as to any material fact and that

the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Substantive law determines which facts are material[] and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Jesinger v. Nev. Fed. Credit Union*, 24 F.3d 1127, 1130 (9th Cir. 1994). The dispute must also be genuine, that is, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party, however, need not disprove matters on which the opponent has the burden of proof at trial. *Id.* at 323. In such cases, the burden is on the nonmoving party to establish a genuine issue of material fact. *Id.* at 322–23. The nonmoving party "may not rest upon the mere allegations or denials of [the party's] pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

**DISCUSSION**

**I.      The Parties' Motions for Sanctions Are Denied.**

As a preliminary matter, both parties' requests for sanctions, based on the spoliation of evidence, are denied. To obtain sanctions based on the spoliation of evidence, a party must demonstrate the presence of three elements: "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Melendres v. Arpaio*, 2010 WL 582189, at *4 (D. Ariz. Feb. 12, 2010) (citing *In re Napster, Inc. Copyright Litig.*, 462 F. Supp.2d 1060, 1078 (N.D. Cal. 2006)). In most instances, the remedy for destruction of evidence is an adverse inference

instruction at trial, the exclusion of evidence, or the imposition of costs and fees.[2] *See id.* In "egregious" cases, however, where a party intentionally or willfully destroys relevant evidence and the other party is irreparably prejudiced, some courts have also imposed a sanction of default. *See Anheuser-Busch, Inc. v. Nat. Beverage Distribs.*, 69 F.3d 337, 348 (9th Cir. 1995).

In this case, both parties offer very similar arguments with respect to their claims that the other destroyed evidence. GMS contends that Plaintiffs were negligent in preserving evidence because they failed to save electronic copies of potentially relevant email messages that were saved on Mr. Mamola's home computer, which crashed. (*See* Dkt. # 141.) Plaintiffs argue that GMS was negligent in preserving evidence because it failed to back-up electronic copies of potentially relevant email communications regarding Mr. Mamola's termination, which were lost when the Company's computer network crashed. (Dkt. # 132.) Both parties submit evidence that they did not act with the requisite state of mind and attest that no relevant evidence was lost. Thus, there are issues of fact with respect to the parties' claims that the other unlawfully destroyed evidence.

Nonetheless, to the extent that the parties seek partial summary judgment or default judgment on the basis that the other destroyed evidence, those requests are denied. Neither Plaintiffs nor GMS have presented evidence of the type of "egregious misconduct" that warrants an entry of default. *See Anheuser-Busch*, 69 F.3d at 348.[3]

## II. Plaintiffs' ADA Claims

Both parties move for summary judgment on various issues pertaining to Plaintiffs' ADA claims. While summary judgment is appropriate on some aspects of these claims, genuine issues of material fact exist with respect to most aspects of Plaintiffs' ADA claims.

---

[2] Neither party in this case has requested the exclusion of evidence or the imposition of costs and fees.

[3] The Court, however, may consider providing the jury with adverse inference instructions, to the extent that evidence supporting such instructions is introduced at trial.

### A. Plaintiffs' Reasonable Accommodation Claim

The Court rejects GMS' request for summary judgment on Plaintiffs' claim that the Company denied Mr. Mamola a reasonable accommodation. "Under the ADA, an employer is required to provide reasonable accommodations to disabled employees "'unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the employer.'" *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1089 (9th Cir. 2002) (quoting 42 U.S.C. § 12112(b)(5)(A)) (brackets omitted). "Once an employer becomes aware of the need for accommodation, that employer has a mandatory obligation under the ADA to engage in an interactive process with the employee to identify and implement appropriate reasonable accommodations." *Humphrey v. Memorial Hospitals Ass'n*, 239 F.3d 1128, 1137 (9th Cir. 2001) (citation omitted). An employer, however, need not "provide an employee the accommodation he requests or prefers[;]" instead, "the employer need only provide some reasonable accommodation[,]" *Zivkovic*, 302 F.3d at 1089, that "enable[s] the employee to perform the duties of the position." *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1115 (9th Cir. 2000), *vacated in part on other grounds by*, 535 U.S. 391 (2002).

In this case, Plaintiffs contend that GMS denied a reasonable accommodation when it refused to allow Mr. Mamola to work from home while he was recovering from surgery to correct an issue with his prosthetic eye. (*See* Dkt. ## 131, Ex. 3 at 43; 133 at ¶¶ 63–64.) And while GMS contends that it provided a reasonable accommodation when it granted Mr. Mamola a leave of absence while he was in recovery, genuine issues of material fact exist as to whether GMS' grant of unpaid leave, as opposed to his request to telecommute from home, was a reasonable and effective accommodation under the ADA. Here, Plaintiffs present evidence that Mr. Mamola could have "perform[ed] the duties of [his] position" *while* he was recovering from eye surgery if the Company had granted his request to work from home. *Barnett*, 228 F.3d at 1115. (Dkt. # 133, Ex. X.) A reasonable fact finder could therefore conclude that unpaid leave actually prevented Mr. Mamola from earning wages for work that he would have performed if GMS had granted the requested accommodation. Thus,

the Court holds that unpaid leave may not be reasonable when an employee specifically requests another accommodation that would allow him to perform the essential functions of the position without missing work. *See Woodson v. Int'l Bus. Machines, Inc.*, 2007 WL 4170560, at *5 (N.D. Cal. Nov. 19, 2007 (noting that leave may not accommodate a disabled employee if other accommodations would be more effective); *cf. Jadwin v. County of Kern*, 610 F. Supp. 1129, 1176 n. 20 (E.D. Cal. 2009) (implying that a leave of absence may not be sufficient when allowing the employee to work "part-time while making a 'gradual return to full-time work'" would "be a reasonable accommodation").

Moreover, while an unpaid leave of absence "for medical treatment *may* be a reasonable accommodation under the ADA," such leave generally must allow the employee to resume the essential functions of his position upon return. *Humphrey*, 239 F.3d at 1135–36 (emphasis added). Mr. Mamola was terminated almost immediately after returning from leave. Because a reasonable jury could conclude that GMS did not make Mr. Mamola's position, or a similar position, available to him upon return, it is unclear whether the unpaid leave actually accommodated Mr. Mamola. *See id.*

The Court also rejects GMS' argument that Mr. Mamola requested permission to work from home for a reason unrelated to his alleged disability. Relying on *Sanders v. Arneson Prods., Inc.*, 91 F.3d 1351, 1353 (9th Cir. 1996), GMS contends that Mr. Mamola requested this accommodation, not because of a disability under the ADA, but due to a separate problem with his prosthetic eye that required surgery. In *Sanders*, a cancer survivor argued that his employer failed to provide a reasonable accommodation when it refused to extend his leave of absence while he was recovering from a psychological impairment related to cancer. *Id.* Though the court indicated that cancer may qualify as a disability under the ADA, it held that the psychological condition did not. *Id.* at 1354. Essential to the court's holding, however, was the fact that the employee plaintiff conceded that "his cancer and psychological impairment were two distinct" conditions. *Id.* at 1353. Nevertheless, unlike in *Sanders*, Plaintiffs in this case do not concede that the problem with Mr. Mamola's prosthetic eye is "distinct" from his other impairments. *See id.* Instead, Plaintiffs present

evidence that the loss of Mr. Mamola's left eye significantly impacts his ability to care for himself, to pick up objects, and to walk normally. (Dkt. # 133 ¶ 7, 10–11, 14–25.) Moreover, Plaintiffs present evidence that Mr. Mamola did not request permission to work from home merely to recover from eye surgery, but to better cope with other impairments caused by his alleged disability. *See Sanders*, 91 F.3d at 1354 (observing that "episodic outbreaks of an underlying permanent condition" may necessitate a reasonable accommodation under the ADA). Accordingly, there are issues of fact with respect to whether the condition with Mr. Mamola's prosthetic eye is distinct from his alleged disability.

Additionally, while GMS asserts that it denied Mr. Mamola's telecommuting request due to security concerns about its computer network, the undisputed record indicates that GMS gave several other employees access to the computer network from home and even allowed a non-disabled employee permission to periodically work from home. (*See* Dkt. ## 133 at ¶ 86; 140 at ¶ 86.) Thus, material issues of fact preclude summary judgment on Plaintiffs' reasonable accommodation claim.

### B. Plaintiffs' Discrimination and Retaliation Claim

Genuine issues of material fact also preclude summary judgment on Plaintiffs' discrimination and retaliation claims under the ADA, except to the extent that those claims are based on GMS' decision to restrict Mr. Mamola's driving privileges. To establish a *prima facie* case of discrimination under § 12112(a) of the ADA, a plaintiff must demonstrate that (1) he is disabled, (2) he is a qualified individual able to perform the essential functions of the job, and (3) he suffered an adverse employment action because of his disability. *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1246 (9th Cir.1999). An adverse employment action is one that materially alters the "terms and conditions" of the plaintiff's employment. *See, e.g.*, *Kang v. U. Lim. Am., Inc.*, 296 F.3d 810, 819 (9th Cir. 2002). Similarly, under § 12203(a) of the ADA, "[a] *prima facie* case of retaliation requires a plaintiff to show: (1) involvement in a protected activity, (2) an adverse employment action and (3) a causal link between the two." *Alvarado v. Cajun Operating Co.*, 588 F.3d 1261, 1268 (9th Cir. 2009) (quotation omitted). Once a plaintiff establishes a *prima facie* case, the employer must

provide a legitimate explanation for its decision that is non-discriminatory and non-retaliatory. *See Raytheon Co. v. Hernandez*, 540 U.S. 44, 50 (2006) (applying *McDonnell Douglas's* burden shifting framework in ADA cases). The burden then shifts backs to the plaintiff to show that the employer's reason is pretext for discrimination or retaliation. *See Collings v. Longview Fibre Co.*, 63 F.3d 828, 834 (9th Cir. 1995) *cert denied*, 516 U.S. 1048 (1996) (addressing pretext in the context of an ADA disparate treatment claim); *see also Brown v. City of Tucson*, 336 F.3d 1181, 1187 (9th Cir. 2003) (analyzing pretext in the context of an ADA retaliation claim).

To demonstrate pretext, a plaintiff must show that a "'discriminatory [or retaliatory] reason more likely motivated the employer," or the plaintiff must demonstrate "that the employer's proffered explanation is unworthy of credence.'" *Brown*, 336 F.3d at 1188 (quoting *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir.2002)). To show that an employer was more likely motivated by a discriminatory or retaliatory motive, a plaintiff must present direct or circumstantial evidence of the employer's allegedly illegal motive. *See id.* To satisfy the unworthy of credence test, a plaintiff must identify specific inconsistencies, contradictions, implausibilities, or weaknesses in the employer's explanation so that a reasonable fact finder could infer that the employer did not act for the asserted reason. *See Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1037 (9th Cir. 2005); *see also Hernandez v. Arizona*, 2010 WL 1193727, at *9 (D. Ariz. Mar. 22, 2010). Where the parties rely on circumstantial evidence of pretext, that evidence must be sufficiently "specific and substantial" to "raise a genuine issue of material fact under Rule 56(c)." *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1029 (9th Cir. 2006).

### 1. Driving Restrictions

The Court grants summary judgment in favor GMS to the extent that Plaintiffs' ADA claim attempts to impose liability on the Company for imposing restrictions on his ability to drive on Company business. Here, Plaintiffs fail to establish a *prima facie* case of disability discrimination under the ADA. While GMS admits that it restricted Mr. Mamola from driving on Company business, there is no evidence in the record that the restrictions on Mr.

- 10 -

Mamola's driving privileges materially altered the terms and conditions of his employment. *Cf. Kellogg v. Energy Safety Servs. Inc.*, 544 F.3d 1121, 1126 (10th Cir. 2008) (noting that driving is not itself a major life activity under the ADA). Here, it is undisputed that GMS made no change to Mr. Mamola's hours, wages, benefits, or other conditions of his employment. (Dkt. ## 131 at ¶ 65; Dkt. 139 at ¶ 65.) It is further undisputed that transportation was provided to Mr. Mamola whenever he requested it. (Dkt. ## 131 at ¶ 14; Dkt. # 139 at ¶ 14.) Additionally, to the extent that driving was an essential function of Mr. Mamola's position, the undisputed record indicates that Mr. Mamola's seizures made him unqualified to perform that function. *See Nunes*, 164 F.3d at 1246 (observing that a disabled employee's ADA claim fails if he cannot perform the essential functions of the job).

Furthermore, even if GMS did alter the essential terms of Mr. Mamola's employment by restricting his driving privileges, the uncontroverted record provides that GMS had a non-discriminatory reason for doing so. *See Collings*, 63 F.3d at 834 (9th Cir. 1995) (observing that once an employer offers legitimate, nondiscriminatory reasons for an adverse employment action, the burden shifts to the employee to demonstrate that the articulated reason is pretext for disability discrimination). Here, it is undisputed that Mr. Mamola was involved in at least two automobile accidents that occurred when he suffered an involuntary seizure while driving. Due to safety concerns, GMS subsequently imposed restrictions on Mr. Mamola's ability to drive on official company business. (Dkt. ## 133 at ¶¶ 45–47; 140 ¶¶ 45–47.) Plaintiffs do not offer evidence showing that this reason was pretext for discrimination.

### 2. Mr. Mamola's Termination

Plaintiffs, however, survive summary judgment to the extent their ADA claim alleges that GMS discriminated and retaliated against Mr. Mamola when the Company terminated him. At this stage in the proceedings, GMS does not contend that Plaintiffs fail to make out a *prima facie* case of disparate treatment and retaliation. (Dkt. # 130 at 10–11.) Instead, GMS contends that it had a legitimate reason for terminating Mr. Mamola because he falsified a Company document when he backdated his Compensation Agreement. (*Id.*) Plaintiffs,

1 however, have presented sufficient evidence for a reasonable fact finder to determine that
2 GMS' offered explanation for terminating Mr. Mamola was pretext for discrimination and
3 retaliation. *See Cornwell*, 439 F.3d at 1029.

4 First, Plaintiffs have presented evidence suggesting that GMS engaged in antagonistic
5 behavior toward Mr. Mamola on the basis of his disability. *See Brown*, 336 F.3d at 1188
6 (observing that an employer's explanation may be pretextual for discrimination when there
7 is evidence that a discriminatory or retaliatory reason motivated the adverse employment
8 action). According to Plaintiffs' evidence, GMS discussed taking away Mr. Mamola's largest
9 account and reducing his salary based on his request for leave. (Dkt. # 133 at ¶ 109.)
10 Plaintiffs have further presented evidence that Mr. Mamola was terminated just four weeks
11 after he filed his Charge of Discrimination with the EEOC. *Winarto v. Toshiba Am. Elecs.*
12 *Components, Inc.*, 274 F.3d 1276, 1287 n. 10 (9th Cir. 2001) (observing that a plaintiff's
13 EEOC complaint, which closely preceded a poor performance review supported a reasonable
14 inference that his employer acted with a retaliatory motive). And while the timing of GMS'
15 employment decision is part of Plaintiffs' *prima facie* case, the Court may consider the
16 proximity of events in its analysis of both the *prima facie* case and pretext. *See Little v.*
17 *Windermere Relocation, Inc.*, 301 F.3d 958, 970 (9th Cir. 2001).

18 Similarly, Plaintiffs have presented sufficient evidence for a reasonable fact finder to
19 determine that the Company's reason for terminating Mr. Mamola is unworthy of credence.
20 *See Brown*, 336 F.3d at 1188. Although GMS contends that it terminated Mr. Mamola
21 because he falsified a company document by backdating his Compensation Agreement,
22 Plaintiffs offer evidence that GMS has previously told Mr. Mamola he was "delinquent"
23 because he failed to sign the Agreement by January 15, 2007. (Dkt. # 133, Ex. DD at 149.)
24 The Company, however, did not provide Mr. Mamola with a hard copy of the Agreement for
25 his review until January 29, 2007. (*Id.*) Thus, it appears that GMS terminated Mr. Mamola
26 for backdating the Agreement, even though the Company did not provide him with an
27 opportunity to sign the Agreement by the required date. Further, prior to Mr. Mamola's
28 termination, GMS had never fired an employee for providing incorrect information in a

company document. Instead, when a non-disabled employee provided incorrect information in a Company vacation request form, GMS did nothing. (Dkt. # 133 at ¶¶ 139–150.) Likewise, GMS did not take disciplinary action against an employee who put the wrong date on an insurance form or a supervisor who backdated an employee evaluation. (Dkt. # 133 at ¶¶ 151–167.) Viewing these facts in the light most favorable to the Plaintiffs, GMS' reason for terminating Mr. Mamola may be pretext. *See Hernandez*, 2010 WL 1193727, at *9 (noting that an employer's implausible explanation for terminating an employee suggests that the explanation is unworthy of credence).

The Company also appears to have provided inconsistent or contradictory reasons for terminating Mr. Mamola. *See Dominguez-Curry*, 424 F.3d at 1037 (noting that inconsistencies, contradictions, or shifting explanations for terminating an employee tend to show that an employer's proffered reason for terminating that employee is pretext). While Maze, the Company's president, testified that Mr. Mamola was terminated for putting the wrong date on his Compensation Agreement, an email from GMS' vice president, sent the day before Mr. Mamola was fired, indicates that she thought Mr. Mamola should be terminated or disciplined for "insubordination, slander, disruption amongst employees" and because "he clearly opposes GMS management." (Dkt. # 133, Ex. JJ at 1938.) Accordingly, the Court finds that genuine issues of material fact preclude summary judgment in the Company's favor on plaintiffs' ADA discrimination and retaliation claims.

### C. Disability & Employment Status Under the ADA

In their Motion for Partial Summary Judgment, Plaintiffs argue that Mr. Mamola is disabled under the ADA as a matter of law. An individual is disabled within the meaning of the ADA if he satisfies a three-part test: (1) he must have a recognized "impairment;" (2) he must identify one or more appropriate "major life activities;" and (3) he must show that the impairment "substantially limits" one or more of those major life activities. *See Bragdon v. Abbott*, 524 U.S. 624, 631 (1998); *see also Humphrey*, 239 F.3d at 1133 (defining disability as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual"). While the first two inquires can be decided by the Court as

a matter of law, whether an impairment *substantially* limits a major life activity is ordinarily a "factual question for the jury." *Bristol v. Bd. of County Comm'rs of Clear Creak*, 281 F.3d 1148, 1156–57 (10th Cir. 2002) *vacated-in-part on other grounds by*, 281 F.3d 1148 (2002) (en banc); *see also Hogan v. Ogden*, 2008 WL 2954245, at *5 (E.D. Wash. July 30, 2008) (observing that "it is a jury question as to whether" an employee's condition "constitute[s] a physical impairment substantially limiting [a] major life activity . . . under the ADA"). When determining whether an individual is disabled, courts are required to broadly construe the definition of a disability. *Rohr v. Salt River Project Agric. Improvement & Power Dist.*, 555 F.3d 850, 861 (9th Cir. 2009).

Plaintiffs present evidence that Mr. Mamola has experienced significant injury including loss of an eye, loss of brain tissue, and permanent cosmetic disfigurement. (Dkt. # 133 at ¶¶ 7–21.) They also present evidence that Mr. Mamola's condition impacts his sense of smell, taste, motor skills, vision, ability to care for himself, and his ability to interact with others. (*Id.*) Defendants do not dispute this. (Dkt. # 140 at ¶¶ 7–21.) Accordingly, Plaintiffs have established the first two requirements of the statutes—that Mr. Mamola suffers from an impairment that affects a major life activity. *See Bristol*, 281 F.3d at 1156–57. Nevertheless, it is a jury question whether Mr. Mamola's impairment *substantially* limits one or more of these major life activities. *See id.* at 1156–57. Accordingly, the Court denies Plaintiffs' Motion to the extent it seeks a declaration that Mr. Mamola was disabled as a matter of law.

GMS concedes that it is an employer, that Mr. Mamola is an employee, and that Mr. Mamola's termination is an adverse employment action as defined by the ADA. (Dkt. # 141 at 2 n. 1.) The Court therefore grants summary judgment on these issues in Plaintiffs' favor.

### III. Plaintiffs' FMLA Claim

Both parties move for summary judgment with respect to different aspects of Plaintiffs' FMLA claim. While material issues of fact preclude summary judgment in favor of GMS on this claim, the Court grants partial summary judgment in favor of Plaintiffs on their FMLA claim.

**A. Mr. Mamola's Failure to Comply with the FMLA's Notice Provisions**

Under the FMLA, it is unlawful for an employer to consider "'the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions, or disciplinary actions.'" *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1122 (9th Cir. 2001) (quoting 29 C.F.R. § 825.220(c)). The Act further indicates that employees should provide employers with at least thirty-days notice prior to taking leave when the need for leave is foreseeable. *See* 29 U.S.C. § 2612(e)(2). When an employee fails to provide the requisite notice, the employer is permitted to delay FMLA benefits to that employee. *See Bachelder*, 259 F.3d at 1130 ("Employees must notify their employers in advance when they plan to take foreseeable leave for reasons covered by the Act.")

On summary judgment, GMS acknowledges that it granted Mr. Mamola's request for FMLA leave. The Company nevertheless argues that Plaintiffs' FMLA claim is barred because Mr. Mamola could have, but did not, provide thirty-days prior notice before taking FMLA leave. The FMLA, however, does not permit an employer to grant an employee's request for statutory leave and then terminate the employee for his or her failure to comply with the notice provisions. As other courts have indicated, such an approach violates the FMLA. *See, e.g.*, *Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 554 (6th Cir. 2006). In *Killian*, for instance, the Sixth Circuit explicitly held that the FMLA "do[es] not permit an employer to terminate an employee merely for failure to provide timely notice." *Id.* Instead, when an employee fails to comply with the FMLA's thirty-day notice requirement, an employer's "only legal recourse" is "either to waive the notice requirement or to delay [the employee's] leave." *Id.* To hold otherwise would allow an employer to terminate an employee after causing him or her to believe that or she was protected under the FMLA. *See id.*

In this case, GMS could have postponed Mr. Mamola's leave based on his failure to comply with the FMLA's notice provisions, but it did not do so. By explicitly approving Mr. Mamola's "requested FMLA leave . . . , at minimum, there is a triable issue as to whether" GMS "waived its . . . challenge to the timeliness of [Mr. Mamola's] notice." *See Jadwin*, 610

F. Supp.2d at 1164 (citation omitted). To hold that Mr. Mamola has no claim under the FMLA would allow employers to terminate employees for failure to comply with the notice provisions, even after the employer expressly waived those provisions by granting the employee's request for FMLA leave.

The cases GMS cites in support of its argument that Plaintiffs' FMLA claim is barred for failure to comply with the thirty-day notice provision are not persuasive. In *Bailey v. Amsted Indus. Inc.*, 172 F.3d 1041, 1045–46 (8th Cir. 1999), for instance, an employer terminated an employee due to excessive absenteeism. And while the Eighth Circuit observed that the employee failed to comply with Act's notice provisions, there was no evidence in the record that the employer waived those provisions by granting FMLA leave. *Id.* at 1046. Similarly, in *Gilliam v. United Parcel Serv.*, 233 F.3d 969, 970–71(7th Cir. 2000), the court upheld summary judgment because there was no evidence that the employer granted FMLA leave to an employee who failed to comply with § 2612(e)(2)'s notice provisions. Instead, the employee in *Gilliam* was terminated because he failed to return to work after his employer denied leave. *Id.* Indeed, GMS does not cite any authority where an employer explicitly approved FMLA leave, terminated the employee for taking leave, and then escaped liability because the employee failed to comply with the FMLA's thirty-day notice provision.

### B. Protected Activity & Employment Status Under the FMLA

GMS next argues that a request for FMLA leave does not constitute a protected activity under the statute. The FMLA, however, protects an employee's "exercise" or "attempt to exercise" his or her FMLA rights from unlawful interference. *See* 26 U.S.C. § 2615; *see also Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002). Accordingly, as a matter of law, Mr. Mamola's request for FMLA leave constitutes a protected activity under the statute. *See* 26 U.S.C. § 2615; *see also Bachelder*, 259 F.3d at 1130 (9th Cir. 2001) (holding that the use of FMLA-protected leave as a negative factor in an employment decision is prohibited).

In addition, Plaintiffs assert as a matter of law that GMS was an employer and that Mr. Mamola was an employee under the FMLA. Because Plaintiffs have presented undisputed evidence of the relevant employment status, the Court grants summary judgment in their favor on these issues. (*See* Dkt. ## 133 at ¶ 1; 140 at ¶ 1.) Thus, with respect to Plaintiffs' FMLA claim, the primary question remaining for trial is whether Mr. Mamola's request for and receipt of FMLA-protected leave was a factor in GMS' decision to terminate him.

**IV.   Title VII Claim**

Plaintiffs concede that dismissal of their gender discrimination claim is proper. (Dkt. # 138 at 16.) Summary judgment is therefore granted in GMS' favor on the Title VII claim.

**V.   FLSA Claim**

Next, GMS moves for summary judgment on Plaintiffs' FLSA overtime claim. Plaintiffs allege that Mr. Mamola was required to work overtime for GMS but that he was not compensated for that overtime. Under the FLSA, employers are generally required to "pay employees one and one-half times their regular rates of pay for all hours worked in excess of forty in a workweek." *Ogden v. CDI Corp.*, 2009 WL 4508502, at *1 (D. Ariz. Dec. 1, 2009) (quoting *Trinh v. JP Morgan Chase & Co.*, 2008 WL 1860161, at *1 (S.D. Cal. April 22, 2008)). The FLSA has an exemption, however, for highly compensated employees. 29 C.F.R. § 541.601. When this exemption applies, an employee's wages and hours are not regulated under the Act. *Ogden*, 2009 WL 4508502, at *1.

The highly compensated employee exemption applies to employees who have a total annual compensation of at least $100,000 and who "customarily and regularly" perform one of the exempt duties of an administrative employee. 29 C.F.R. § 541.601. Those duties include "the performance of work directly related to the management or general business operations of the employer or the employer's customers," such as "tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations; government relations; computer network; internet

and database administration; legal and regulatory compliance; and similar activities." 28 C.F.R. § 541.201(a), (b). These administrative duties, however, are distinguishable from "working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a).

GMS has presented undisputed evidence that Mr. Mamola received compensation of at least $100,000 during the time period relevant to their FLSA claim.[4] (*See* Dkt. ## 131 ¶ 66; 139 at ¶ 66.) Likewise, GMS offers evidence that Mr. Mamola's regular work functions included purchasing, procurement, and quality control. *See* 28 C.F.R. § 541.201(b). During his July 13, 2009 deposition, Mr. Mamola stated that he "negotiated manufacturing contracts for yearly purchases for individual parts, subassemblies, or assemblies." (Dkt. # 131 at ¶ 64.) He also indicated that he worked closely with management to procure pricing information and materials for company products. (*See id.*) Mr. Mamola's resume further provides that his responsibilities at GMS included "purchasing," "quality integration," and "efficiency improvements." (Dkt. # 133, Ex. 27.) Plaintiffs do not dispute this, and they do not offer any evidence to the contrary. (*See* # 139 at ¶ 66.) Instead, Plaintiffs incorrectly argue that the highly compensated employee exception requires GMS to also prove that Mr. Mamola exercised "discretion" or "independent judgment" in the performance of his duties. (Dkt. # 138 at 17.) While "discretion" or "independent judgment" is necessary to prove that an employee is exempt under FLSA's administrative employee exception, "the highly compensated employee exemption 'removes any requirement that an employer prove that an administrative employee exercised discretion in the performance of [his] duties.'" *Ogden*, 2009 WL 4508502 at *2 (quoting *Amendola v. Bristol-Myers Squibb Co.*, 558 F. Supp.2d 459, 478 (S.D. N.Y. 2008)); *see also Sarviss v. Gen. Dynamics Info. Tech.*, 663 F. Supp.2d 883, 893 (C.D. Cal. 2009). Accordingly, Mr. Mamola's overtime work in 2006 falls under the highly compensated employee exception.

---

[4] Plaintiffs' FLSA claim covers the two-year period before September 12, 2008, the date the complaint was filed. *See* 29 U.S.C. § 255(a); *McLaughlin v. Richland Shoe Co.*, 486 128, 133 (1988).

- 18 -

1 And while Mr. Mamola did not earn at least $100,000 in 2007, Plaintiffs do not present any evidence that Mr. Mamola preformed work that qualified for overtime compensation. As the Supreme Court has held, "[a]n employee who brings suit under [the FLSA] for . . . unpaid overtime compensation . . . has the burden of proving that he preformed work for which he was not properly compensated." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686–87 (1946), *superseded on other grounds by statute as noted in*, *Carter v. Panama Canal Co.*, 463 F.2d 1289 (D.C. Cir. 1972). Plaintiffs have not met this burden. Summary judgment is therefore granted in favor of GMS on Plaintiffs' FLSA claim.

**VI. The Company's Affirmative Defenses**

In its Answer to Plaintiffs' Complaint, GMS asserts several affirmative defenses. Plaintiffs have moved for summary judgment on two of these defenses: failure to mitigate damages and failure to exhaust administrative remedies.

GMS concedes that it has no mitigation of damages defense (Dkt. # 141 at 2 n. 1.); therefore, the Court grants summary in Plaintiffs' favor on this issue.

The Court also grants summary judgment in Plaintiffs' favor on GMS' defense that Mr. Mamola failed to exhaust his administrative remedies. To raise a timely discrimination or retaliation claim, a party first must file a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") within 300 days of the alleged violation. *See* 42 U.S.C. § 2000e-5. After receiving a Right to Sue letter from the EEOC, a party has ninety days to file its claim. *See id.* at § 2000e-5(f)(1).

Plaintiffs timely filed their ADA claim. It is undisputed that Mr. Mamola filed his Charge of ADA-based discrimination only three days after he was terminated. Mr Mamola's reasonable accommodation claim also falls well within the applicable 300-day window. It is further undisputed that Mr. Mamola filed the instant lawsuit within the ninety-day period after receiving the Notice of his Right to Sue from the EEOC. Therefore, inasmuch as Plaintiffs' retaliation and discrimination claims are based on GMS' refusal to grant a reasonable accommodation and Mr. Mamola's termination, those claims are timely under the ADA.

**IT IS THEREFORE ORDERED** that the parties' Motions for Summary Judgment are **GRANTED-IN-PART** and **DENIED-IN-PART** (Dkt. ## 130, 132):

(1) The Parties' requests for sanctions are **DENIED** as set forth in this Order;

(2) GMS' request for summary judgment on Plaintiffs' ADA claims is **DENIED,** except to the extent that Plaintiffs' discrimination claim is based on the Company's decision to restrict Mr. Mamola's driving privileges;

(4) Summary judgment is **DENIED** on Plaintiffs' contention that Mr. Mamola is disabled as a matter of law under the ADA;

(5) Summary judgment is **GRANTED** in Plaintiffs' favor on their claim that GMS is an employer, that Mr. Mamola is an employee, and that Mr. Mamola's termination is an adverse employment action within the meaning of the ADA;

(6) GMS' request for summary judgment on Plaintiffs' FMLA claim is **DENIED**;

(7) Summary judgment is **GRANTED** in Plaintiffs favor on their claim that GMS is an employer, that Mr. Mamola is an employee, and that Mr. Mamola engaged in an protected activity under the FMLA;

(8) Summary judgment is **GRANTED** in GMS' favor on Plaintiffs' Title VII and FLSA claims;

(8) Summary judgment is **GRANTED** in Plaintiffs' favor on GMS' affirmative defenses of mitigation of damages and failure to exhaust administrative remedies.

DATED this 9th day of April, 2010.

*/s/ H. Murray Snow*
G. Murray Snow
United States District Judge