**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Cyril Mamola III, and Rhonda Mamola, husband and wife, ,<br><br>                    Plaintiff,<br><br>vs.<br><br>Group Manufacturing Services, Inc., an Arizona Corporation,<br><br>                    Defendant. | No. 08-1687-PHX-GMS<br><br>**ORDER AND JUDGMENT** |

Pending before the Court is the verdict on Plaintiff Cy Mamola's ADA retaliation claim and the issue of appropriate equitable relief (back pay and front pay) on the ADA claims for which liability is found.

## I. The Retaliation Claim

The remaining liability question for the Court is whether Defendant retaliated against Mr. Mamola for the exercise of his rights under the ADA. Although the jury has already determined that a motivating factor for Plaintiff's termination was Defendant's discrimination based on his disability, at the same time, the Court can also find that Group Manufacturing Services Inc. (hereafter "Group") retaliated against Mr. Mamola for the exercise of his rights under the ADA if Mr. Mamola has established a "causal link" between his termination and his filing of the ADA claim with the EEOC.

1    In light of the jury's determination that a motivating factor for Mr. Mamola's

2    termination was discrimination against him by Group due to his disability, it necessarily

3    rejected Group's claim that it terminated Cy Mamola for dishonesty and for his misdating

4    of a company document.  Group has testified that it did not fire Mr. Mamola for other

5    reasons. Specifically, management testified that Mr. Mamola was a good salesman with a

6    positive performance record.  Group also testified, however, that management would get

7    upset when it would receive what it considered to be unwarranted complaints and/or claims

8    by Mr. Mamola.   Group management also testified that it believed that the ADA

9    discrimination claim by Mr. Mamola to the EEOC was unmerited, and that it was "surprised"

10   by this claim.  Regardless of whether there was merit to Mr. Mamola's discrimination claim,

11   and the jury found that there was, Group could not terminate Mr. Mamola if the termination

12   was in part for filing an ADA claim with the EEOC.  The Court finds that the trial testimony,

13   when considered in light of Mr. Mamola's ensuing termination which was otherwise

14   unexplained, is sufficient to create a causal link between Mr. Mamola's termination and his

15   filing of the ADA claim with the EEOC.  It thus finds that the preponderance of the evidence

16   demonstrates that Group retaliated against Mr. Mamola for the exercise of his rights under

17   the ADA, and that Group is liable for Mr. Mamola's retaliation claim in addition to his

18   claims for discrimination and failure to reasonably accommodate.

19   Nevertheless, because punitive and compensatory awards are not available remedies

20   for ADA retaliation claims, claimants are limited to equitable relief. *Alvarado v. Cajun*

21   *Operating Co.,* 588 F.3d 1261, 1269-70 (9th Cir. 2009).  Plaintiff was already entitled to

22   equitable relief by the jury's finding of liability on his other ADA claims.  Group's liability

23   on the retaliation claim thus does not serve to increase the equitable relief to which Plaintiff

24   is already entitled.  Plaintiff conceded as much at oral argument on this claim.

25   The jury awarded Mr. Mamola compensatory damages of $125,000 and punitive

26   damages of $100,000 on his ADA discrimination claim.  The jury further found that

27   Defendant did not seek to reasonably accommodate Mr. Mamola's disability.  It determined,

28   however, that Mr. Mamola was only entitled to nominal compensatory damages on this

1    failure, but made an additional punitive award of $50,000 on Group's failure to reasonably

2    accommodate Mr. Mamola.  The jury further determined that Group was not liable on Mr.

3    Mamola's FMLA claim.  The parties acknowledge that, pursuant to statute, the jury's awards

4    of compensatory and punitive damages on the above ADA claims  are collectively capped

5    at $50,000, in addition to any equitable back pay or front pay award to be calculated by the

6    Court.  42 U.S.C.§ 1981a(b)(3).  It is ordered, therefore, reducing the compensatory and

7    punitive damages awards on Plaintiff's ADA claims to fifty thousand dollars ($50,000).

8                                    **II.  Equitable Relief On the ADA Claims**

9          When a jury finds discrimination on an employment claim, "there is a presumption

10   in favor of back pay awards." *Caudle v. Bristow Optical Co. Inc*, 224 F.3d 1014, 1020 (9th

11   Cir. 2000) (citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421 (1975)).  "'Front pay

12   is the term used to describe damages paid as [prospective] compensation for training or

13   relocating to another position.  An award of front pay is made in lieu of reinstatement when

14   the antagonism between employer and employee is so great that reinstatement is not

15   appropriate.'"  *Id.* (quoting *Fadhl v. City & Cnty. of S.F.,* 741 F.2d 1163, 1167 (9th Cir.

16   1984), *overruled on other grounds by Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)).

17    Here, both parties stipulate that the antagonism is so great that a front pay award is

18   preferable to reinstatement. Still, front pay must be tempered and should not result in a

19   windfall.

20         In making its equitable back pay and front pay determinations, the Court relied on the

21   following determinations.

22         Mr. Clarke, Plaintiff's expert, testified that based on national averages Mr. Mamola

23   would continue to work until he was 62. The Court finds this assumption credible, and there

24   was no real attempt to challenge it by Defendant's expert, Mr. Gaintner.  Further, Mr.

25   Mamola's relative age and seniority with Group suggest that his age may pose some

26   additional challenge to him in finding, and training for, other comparable employment.

27         The evidence demonstrates the dollar value of sales made by Group attributable to Mr.

28   Mamola's customers in 2007.  Given this dollar value amount, and the terms of Mr.

1   Mamola's compensation agreement for 2007, the Court determined what his guaranteed
2   salary plus commission payments would have been in 2007.

3          Both parties' experts apparently assumed that it was appropriate to add to Mr.
4   Mamola's base salary, the value of benefits that would have been paid on his behalf in the
5   following categories: (1) 7.65% of his salary and commission as additional benefits
6   compensation (FICA); (2) an amount to reflect the ESOP contribution on Mr. Mamola's
7   salary;  3) an amount to reflect the difference in health care benefit amounts paid on Mr.
8   Mamola's behalf by Group and subsequently obtained by Mr. Mamola.

9          After listening to both experts on how to appropriately calculate the value of the
10  ESOP benefit, the Court accepts the averaging approach adopted by Mr. Gaintner (ESOP
11  contribution averaged as 16.5% of annual salary) as more probably reflecting the reality of
12  ESOP contributions over time.  It accepts this figure for both back pay and front pay analysis.

13         After having arrived at the sum above calculated, the Court deducted from it: 1)
14  amounts actually paid by Group to Mr. Mamola during 2007; 2) estimated amounts that Mr.
15  Mamola would not have received while in Group's employ in 2007 for his unpaid FMLA
16  leave; 3) the ESOP and FICA contributions attributable to these first two amounts; 4) the
17  amount of salary paid to Mr. Mamola by Garry Gibby in 2007; 5) the amount of salary paid
18  by Precision to Mr. Mamola in 2007; 6) the amount of FICA contribution paid by Precision
19  on Mr. Mamola's behalf in 2007; and 7) the value of  the contribution made by Precision to
20  Mr. Mamola in the form of health insurance in 2007.  The resulting figure was the amount
21  awarded adjusted slightly upward for equitable considerations of pre-judgment interest.

22         Because the sales staff compensation agreements negotiated in early 2008 were
23  principally based on 2007 sales figures, the Court determines that Mr. Mamola's guaranteed
24  salary would not have been reduced in 2008, because there was a high dollar volume of
25  business from his clients in 2007. Mr. Mamola would not, however, have earned any more
26  than his guaranteed salary amount in 2008.  This is due to the drastic reduction of Comtech's
27  orders from Group, as well as some of the reductions by Mr. Mamola's other clients that year.
28  His total client sales for 2008 would not have placed him above the amount for which he

1   would have earned an additional commission, and would have, in fact, resulted in a drastic
2   and enduring reduction in his book of business.  The principal reason for the reduction in
3   Comtech's business with Group was Comtech's decision to take a significant portion of its
4   sheet metal manufacturing business in-house.  This decision preceded Group's decision to
5   terminate Mr. Mamola, and thus is not significantly related to Mr. Mamola's departure.

6       Therefore had he been employed by Group in 2008, Mr. Mamola would have received
7   his guaranteed minimum salary together with the attributable FICA benefit and ESOP
8   contribution on this salary.  From this amount the Court deducts the annual salary Mr.
9   Mamola would have been paid had he kept his job at Precision.  It further deducts the FICA
10  benefit on that amount.  No adjustments will be made for the difference in the health care
11  benefit as the health care offered by Precision was apparently equivalent to the health care
12  offered by Group.  The resulting figure is the value of the lost wages incurred by Mr.
13  Mamola in 2008.

14      As it pertains to Mr. Mamola's post-Group employment and Mr. Mamola's obligation
15  to mitigate his damages, the Court is more persuaded by the "demonstrated capacity"
16  deduction for mitigation of damages made by Mr. Gaintner, than it is by the actual
17  employment approach taken by Mr. Clarke.  The Court further notes that, after having heard
18  all of the evidence in this case, it is more equitable to apply the "demonstrated capacity"
19  mitigation deduction than any actual employment analysis.  This is particularly so in light of
20  some testimony that would suggest that Mr. Mamola was terminated from Precision for job
21  performance issues and was counseled by at least one other employer immediately prior to
22  his termination.  The Court thus applies this demonstrated capacity deduction from this point
23  forward for purposes of calculating both back pay and front pay.

24      By 2009, Mr. Mamola's guaranteed salary, had he continued at Group, would have
25  likely been reduced due to the decline in business undertaken with Group by Mr. Mamola's
26  customers and his inability to replace those declining customers with new accounts.  During
27  the 15 years that he was a salesman for Group, Mr. Mamola did not obtain any significant
28  new clients for the company.  Mr. Mamola acknowledged in his testimony that he was not

1   good at generating new customers.  Thus, the decline in Mr. Mamola's book of business

2   would have been reflected in a decline in his guaranteed salary in 2009.

3          Nevertheless, Mr. Mamola's seniority would protect him from a too-precipitous drop

4   in his guaranteed salary. The continuing decline in customer sales reflected by Comtech

5   taking much of its business in-house would have likely resulted in a gradual but persistent

6   reduction in his guaranteed salary for several years rather than an immediate drop to the

7   compensation level of Mike Havens who replaced Mr. Mamola as Group's salesman on Mr.

8   Mamola's former accounts.  The Court therefore estimates that Mr. Mamola would have

9   received a salary guarantee of $1600 per week in 2009 and that he would not have earned a

10  bonus.  Again to Mr. Mamola's guaranteed salary the Court adds the FICA benefit as well

11  as the resulting ESOP contribution.  From this amount the Court deducts the salary and FICA

12  adjustment resulting from Mr. Mamola's demonstrated capacity.  The Court follows this

13  same basic methodology for all years in which it awards back or front pay.

14         By 2010, Mr. Mamola's minimal salary guarantee would have likely declined again

15  to $1400 and would not have been ameliorated by any ability of Mr. Mamola to replace a

16  declining customer base with new accounts. By 2011, Mr. Mamola's minimum salary

17  guarantee would have declined to $1200 per week, and he would not have earned a bonus.

18  By 2012, the Court believes that Mr. Mamola's minimum salary guarantee would have only

19  slightly declined to $1150 per week, and he would not have earned a bonus.  For the years

20  2013-2017, however, the Court deems that Mr. Mamola's guaranteed salary would not

21  further decline.

22         The Court recognizes that the resulting guaranteed salary amount is still

23  approximately $10,000 higher annually than both Mr. Mamola's demonstrated capacity at

24  Precision and the guaranteed amount that is currently being paid to Mike Havens, who is Mr.

25  Mamola's replacement on all of his former Group accounts.  Nevertheless, in light of the

26  testimony at trial, which for the most part was that Mr. Mamola was a good and serviceable

27  salesman for Group with considerable seniority, there is reason to believe that even in a

28  declining market in which Mr. Mamola does not have the talent necessary to attract new

clients, Mr. Mamola would have been more valuable at Group than he was at Precision. There is further reason to believe that his additional seniority would have resulted in a higher rate of pay than would have been paid to Mike Havens on the same customer accounts. Finally, although the decline in guaranteed salary which the Court presumes over the course of several years due to the loss of business in Mr. Mamola's accounts is also designed to account for some risk that he would not have continued his employ at Group, the preponderance of the testimony was that Mr. Mamola was a good salesman at Group. While the evidence suggests that he did not perform as well elsewhere, there is little testimony on which the Court can conclude that Mr. Mamola would have been very likely to lose his job at Group. The Court finds that under the circumstances no upward adjustment for inflation is appropriate.

Thus, the differential between Mr. Mamola's salary at Group and his demonstrated capacity, plus the incremental FICA benefit and ESOP contribution that would have resulted from his Group salary, results in Mr. Mamola's front pay through the year 2017, when any equitable front pay terminates.

As a result of factoring in additional minor adjustments designed to account for risk assessments, discount rates, and pre-judgment interest on back pay, the Court awards Mr. Mamola the amount of three hundred thousand dollars ($300,000) in back pay and one hundred fifty thousand dollars ($150,000) in front pay as equitable relief. Together with the compensatory and punitive damages awarded by the jury, which are capped at fifty thousand ($50,000), judgment is entered in Mr. Mamola's favor on his ADA and retaliation claims in the total amount of five hundred thousand dollars ($500,000).

**IT IS THEREFORE ORDERED**, pursuant to Rule 58 of the Federal Rules of Civil Procedure, entering judgment on Plaintiff's ADA and retaliation claims in favor of Plaintiff and against Defendant in the amount of $500,000.

/ / /

/ / /

/ / /

- 7 -

1    **IT IS FURTHER ORDERED** entering judgment in Defendant's behalf and against

2    Plaintiff on Plaintiff's FMLA claim. Plaintiff will, therefore, take nothing from Defendant

3    on his FMLA claim.

4        DATED this 2nd day of November, 2010.

5

6    _____

7                    G. Murray Snow
                United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28